UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY

KAREN HENDERSON                                                    PLAINTIFF

v.                                    CIVIL ACTION NO. 3:18-CV-00528-JRW-RSE

SKYVIEW SATELLITE
NETWORKS, INC.                                                     DEFENDANT

## ORDER

1. The Court **DENIES** Skyview's Motion to Dismiss (DN 40).

2. The Court **GRANTS** Skyview's Motion for Summary Judgment (DN 59) and
   **DISMISSES** Henderson's claims for defamation *per se*, defamation *per quod*, breach
   of contract, and tortious interference.

3. The Court **GRANTS IN PART** and **DENIES IN PART** Henderson's Motion for
   Summary Judgment and Rule 37 Relief (DN 79). Skyview cannot pursue the equitable
   remedy of disgorgement but can seek damages for lost profits.

4. The Court **DENIES AS MOOT** Skyview's Motion to Strike Plaintiff's Post-
   Deposition Affidavit (DN 88).

## MEMORANDUM OPINION

This matter is before the Court on Defendant's Motion to Dismiss (DN 40), Defendant's
Motion for Summary Judgment (DN 59), Plaintiff's Motion for Summary Judgment and Rule 37
Relief (DN 79), and Defendant's Motion to Strike Plaintiff's Post-Deposition Affidavit (DN 88).
These issues are now ripe for adjudication.

# I.   BACKGROUND

## A.   Statement of Facts

In September 2014, Karen Henderson began working as a National Audio Sales Manager for Skyview Satellite Networks, Inc. (DN 35, ¶ 13).  Henderson sold advertisements for Skyview and reported to Jeanne-Marie Condo, Skyview's Executive Vice President & General Manager. In October 2016, Henderson notified Skyview of her intention to go to work for a competitor.  The parties negotiated new employment terms in order to entice Henderson to remain with Skyview. (*Id*. at ¶¶ 18-20).  The resulting Employment Agreement outlined Henderson's salary base, commission structure, and guaranteed annual income from 2017-2019.  It provided that Henderson would not "entertain or engage in any employment offers during the three year agreement." (*Id*. at ¶¶ 20-21; DN 40-1).

In early 2017, Henderson became concerned that Skyview was overbilling a client.  (DN 35, ¶ 24).  Upon review, Skyview discovered a system error, which prompted Skyview President Ken Thiele to issue an apology and rebate credit to the client.  (*Id*.).  Henderson claims that shortly after the overbilling incident, she was denied access to information concerning advertisements she sold and was stripped of many of her duties as vice-president.  (*Id*. at ¶¶ 27-28).  She says that Skyview then began to systematically cause financial harm to her by forcing her to share commissions and by pulling her from several lucrative accounts, including the Starcom account, without compensating her for the lost income.  (*Id*. at ¶¶ 29, 31-32).

Beginning in February 2018, Henderson began communicating with Fred Bennett, an executive at Entercom—a direct competitor of Skyview.  (DN 59, 5).  During the next few months, Henderson met with Bennett, spoke with him regularly, and then proceeded to meet with several high-level executives of Entercom.  (*Id*. at 6-8).

In July 2018, Henderson was summoned to Arizona for a meeting with Thiele and other Skyview executives to discuss Henderson's meetings with Entercom executives. At this meeting, Henderson was placed on "administrative leave" and was required to relinquish her laptop computer to Skyview. (DN 35, ¶¶ 34-35).

On July 16, 2018, Condo sent the following email to Henderson's entire email contacts list:

Good morning,

Karen Henderson will be on administrative leave and unavailable the next three weeks. We will have an update for you on Tuesday August 7th. Her fellow sales team is by your side and ready to do a great job. A Skyview executive will reach out by the end of tomorrow so you have a direct contact for care.

You of course, have my contact information below and all of us are by your side.

We ask that you do not contact Karen during this time.

Thank you,
Jeanne-Marie

(*Id.* at ¶ 36). This email went out to over 100 people, many of whom were Henderson's friends, family members, neighbors, and other non-work-related professional contacts. (*Id.* at ¶¶ 37-38). Henderson alleges that she made repeated requests for Skyview to retract the email or provide her with a complete distribution list so she could attempt to mitigate the damage, all of which were ignored. (*Id.* at ¶ 39). Skyview then excluded Henderson from Skyview's 2018 national sales conference, even though she was still an employee with high sales volume. (*Id.* at ¶ 40).

In August 2018, Henderson received a letter terminating her employment with Skyview. The letter stated that Henderson was fired because:

(i) [she] had been pursuing job opportunities with other companies in breach of [her] employment agreement; (ii) [she] had encouraged Skyview personnel to work for a competitor in violation of the Non-Solicitation and Confidentiality Agreement that [she] signed; (iii) [she] had disclosed multiple confidential documents to a third-party[,] also in violation of [her] Non-Solicitation and Confidentiality

3

> Agreement; and (iv) [she] had made disparaging statements about [her] supervisor to third-parties and co-workers.

(DN 40-2, 1).  The termination letter further stated: "As a reminder, you promised for a period of twelve months following date of termination not to solicit Skyview customers or Skyview employees."  (*Id.*; DN 35, ¶ 43).

Condo then sent out another email to Henderson's email contacts, this time stating, in relevant part, that:

> Karen Henderson is no longer employed with Skyview Networks.  We appreciate her efforts in sharing with you one of the most dynamic portfolios in network radio. We wish her the best of luck in her future endeavors.

(DN 35, ¶ 44).  Skyview admits that Condo sent the identified emails but also contends that it believed that all the email recipients were "clients or prospective clients[.]" (DN 39, ¶¶ 32-34, 41-44).

### B.   <u>Procedural History</u>

Henderson initiated the present action against Skyview.  (DN 1).  Through a Second Amended Complaint, Henderson pleaded claims for:  defamation *per se*, defamation *per quod*, breach of contract, declaratory relief, tortious interference, and wrongful discharge.  (DN 35). Skyview responded with an Answer and Amended Counterclaim asserting claims for breach of contract and breach of the duty of loyalty.  (DN 39).  Skyview also moved to dismiss Henderson's wrongful discharge claim.  (DN 40).  Later, Skyview moved for summary judgment on Henderson's claims for breach of contract, defamation, and tortious interference.  (DN 59). Henderson also moved for summary judgment and Rule 37 Relief on two of Skyview's grounds for damages.  (DN 79).  Finally, Skyview moved to strike a declaration attached by Henderson to her response to Skyview's motion for summary judgment.  (DN 88).

## II.    DISCUSSION

### A.    Skyview's Motion to Dismiss:  Wrongful Discharge

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) considers the sufficiency of the complaint.  "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "[A] district court must (1) view the complaint in the light most favorable to the plaintiff and (2) take all well-pleaded factual allegations as true."  *Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009) (citation omitted).  Even so, the Court need not accept a party's "bare assertion of legal conclusions."  *Columbia Nat. Res., Inc. v. Tatum*, 58 F.3d 1101, 1109 (6th Cir. 1995) (citation omitted).  This inquiry is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Iqbal*, 556 U.S. at 679.

Henderson alleges that Skyview wrongfully terminated her in violation of public policy because she opposed fraudulent billing practices.  Skyview contends that Henderson fails to state a claim for wrongful discharge.

Kentucky[1] generally follows the employment-at-will doctrine, under which "an employer may discharge an at-will employee for good cause, for no cause, or for a cause that some might view as morally indefensible."[2]  *Wymer v. JH Props., Inc.*, 50 S.W.3d 195, 198 (Ky. 2001) (citation omitted).  The tort of wrongful discharge creates a "narrow public policy exception" to this rule

---

[1] Skyview argues that Henderson's wrongful discharge claim fails under Kentucky and Arizona law. Kentucky choice-of-law rules use the "any significant contacts" test for tort claims.  *See Saleba v. Schrand*, 300 S.W.3d 177, 181 (Ky. 2009).  Because Henderson lived and worked in Kentucky, Kentucky law applies.

[2] In Kentucky, the existence of an employment agreement does not preclude a wrongful discharge claim.  *See Bednarek v. United Food & Commercial Workers Int'l Union, Local Union 227*, 780 S.W.2d 630, 633 (Ky. App. 1989).

when the employee is fired for a reason that undermines a "most important public policy."  *Hill v. Ky. Lottery Corp.*, 327 S.W.3d 412, 420 (Ky. 2010), *as modified on denial of reh'g* (Dec. 16, 2010) (quoting *Firestone Textile Co. Div. v. Meadows*, 666 S.W.2d 730, 734 (Ky. 1983)).  The Kentucky Supreme Court has clarified that in the absence of "explicit legislative statements prohibiting the discharge," a claim may still be actionable in two situations:  "First, where the alleged reason for the discharge of the employee was the failure or refusal to violate a law in the course of employment.  Second, when the reason for a discharge was the employee's exercise of a right conferred by well-established legislative enactment."  *Grzyb v. Evans*, 700 S.W.2d 399, 402 (Ky. 1985) (citation and internal quotation marks omitted).

Henderson claims she was discharged in retaliation for refusing to violate the law.  This exception generally requires an employer to make an affirmative request that the employee violate the law.  *See, e.g.*, *Charles Print Fulfillment Servs., LLC*, No. 3:11-CV-00553, 2015 WL 5786817, at *7 (W.D. Ky. Sept. 30, 2015) ("To sustain a cause of action under the refusal exception, [the employee] must show that [the employer] made an affirmative request that he violate the law.  He must also demonstrate that he refused to follow [the employer]'s request or instruction.") (citations omitted).

Henderson concedes that Skyview never expressly asked her to commit fraud.  But she says that under *Alexander v. Eagle Manufacturing Co., LLC*, 714 Fed. App'x 504 (6th Cir. 2017), the affirmative request rule is less clear cut.  In *Alexander*, the Sixth Circuit, applying Kentucky law, stated that the "refusal-to-violate" exception to at-will-employment

> is also implicated when an employee learns of illegal activity and, although not directly invited to participate by his employer, knows he will inevitably become complicit in the illegality by performing his normal work responsibilities.

*Id*. at 509.

The Sixth Circuit again took up this issue in *Smith v. LHC Group, Inc.*, 727 Fed. App'x 100 (6th Cir. 2018), reaffirming that Kentucky case law did not require "an explicit request from the employer that the employee violate the law." *Id.* at 107 (citation omitted). In *Smith*, the plaintiff was the director of nursing for healthcare providers that were allegedly engaging in healthcare fraud. She became concerned that "other employees regularly bypassed the proper procedure and admitted patients without the requisite clinical evaluation or documentation." *Id.* at 102-03. The Court concluded that the plaintiff stated a wrongful discharge claim because she "found herself in . . . a situation, knowing—even in the absence of direct instructions to violate the law—that her continued employment would inevitably lead to authorizing fraudulent patient orders and other fraudulent entanglements." *Id.* at 108.

Accepting the facts alleged in the Complaint as true, Henderson's situation is comparable to the facts in *Smith*. Henderson believed that Skyview was systematically overbilling its clients. (DN 35, ¶¶ 24-28, 109). Henderson's primary role was selling advertisement packages to clients to be aired during professional sports games. (*Id.* at ¶ 15). In 2016, Henderson also received a vice-president title, which meant she had more say in company policy and direction. (*Id.* at ¶ 21). Under these facts, Henderson was selling advertisement packages to clients who were being defrauded. Even if she wasn't asked to "sign off" on these transactions, Henderson was the primary point person for the company when representing to her clients the services for which they were charged. If Skyview was investigated for criminal conduct in relation to the alleged overbilling,[3] Henderson would have been implicated as the vice-president overseeing the accounts

---

[3] Although Henderson does not explicitly state which laws the alleged overbilling practices would violate, it is clearly illegal for a company to fraudulently overcharge its clients. *See* KRS § 517.020 (deceptive business practices); KRS § 517.050 (falsifying business records); KRS § 514.040 (theft by deception).

in question.  Fearing that outcome, Henderson claims that she was "trapped in an impossible situation" and "attempted to verify all deliverables for her accounts." (DN 42, 10).  She knew she would "inevitably become complicit in the illegality by performing [her] normal work responsibilities." *Alexander*, 714 Fed. App'x at 509.  That Henderson wasn't expressly asked to violate the law is not dispositive.

Next, Skyview argues that Henderson generally fails to state a plausible claim under *Twombly* and *Iqbal*.  But taking all of Henderson's well-pleaded factual allegations as true, it is not implausible to conclude that a company engaging in fraudulent billing practices might fire a high-level employee who openly questioned and refused to condone such conduct.

They also argue that Henderson failed to plausibly plead causation because the billing issues were discovered some eighteen months before her eventual termination.  The causation prong of a wrongful discharge claim requires a plaintiff to show that "at a minimum that [s]he was engaged in a statutorily protected activity, that [s]he was discharged, and that there was a connection between the protected activity and the discharge." *Follett v. Gateway Reg'l Health Sys., Inc*., 229 S.W.3d 925, 929 (Ky. App. 2007) (internal quotation marks and citation omitted).  Similarly, a retaliation claim generally requires some "causal connection between the protected activity and the adverse employment action." *Brooks v. Lexington-Fayette Urban Cty. Hous. Auth*., 132 S.W.3d 790, 803 (Ky. 2004) (internal quotation marks and citation omitted).

The Sixth Circuit has cautioned that the passage of four months between a protected act and termination is insufficient, without more, to support an inference of retaliation. *Cooper v. City of N. Olmsted*, 795 F.2d 1265, 1272 (6th Cir. 1986) (citations omitted).  This Court has followed *Cooper* to dismiss retaliation claims when there is no evidence of causality and a significant

8

temporal gap.  *See, e.g.*, *Moore v. Humana, Inc.*, No. 3:10-CV-26-S, 2010 WL 2961205, at *2 (W.D. Ky. July 26, 2010).

But according to the Complaint, Henderson did not just report the billing issue and get randomly fired eighteen months later.  Rather, Henderson pleads numerous retaliatory actions in the eighteen months between her report of the incident and her termination.  Henderson claims: she was stripped of many of her vice-presidential duties (DN 35, ¶ 28); she was removed from lucrative accounts and forced to share commissions (*Id*. at ¶ 29); she was pulled from the account in which the initial overbilling occurred (*Id*. at ¶ 31); there was no attempt to compensate her for these losses (*Id*. at ¶ 32); she was placed on administrative leave (*Id*. at ¶ 34); her entire email list, including personal contacts, was emailed to inform them of Henderson's leave (*Id*. at ¶ 36); Skyview did not retract that email (*Id*. at ¶ 39); Henderson was excluded from the national sales conference (*Id*. at ¶ 40); her employment with Skyview was terminated (*Id*. at ¶ 41); and, finally, that same email contact list was informed of her termination (*Id*. at ¶ 44).  Henderson alleges that she continued to perform protected activity by requesting additional information from Skyview to verify that no more inconsistency occurred (*Id*. at ¶¶ 27, 30).  This case is not comparable to others in which an employee was fired many months after committing a protected action with no interim repercussions.  Accepting the pleaded facts as true, Henderson was retaliated against soon after she reported the billing irregularities and consistently thereafter until her position was terminated.

Skyview's motion to dismiss Henderson's wrongful discharge claim should be denied.  The Court is aware that denying Skyview's motion to dismiss Henderson's wrongful discharge claim – while granting Skyview's later motion for summary judgment against Henderson on the breach of contract claim -- appears contradictory.  How can we say Henderson stated a claim that she was illegally fired for refusing to violate the law, but also say she was legally fired for breaching her

9

employment contract?  This contradiction exists because of the different motion standards.  On Skyview's motion to dismiss, the court is bound to accept the well-pleaded facts in Henderson's complaint as true without regard to the evidence provided in support of Skyview's later motions. If the Court could consider this additional evidence, as it will if Skyview moves for summary judgment on Henderson's wrongful discharge claim, the Court would almost certainly grant summary judgment to Skyview on Henderson's wrongful discharge claim.

### B.   Skyview's Motion for Summary Judgment:  Breach of Contract, Defamation, and Tortious Interference

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Judgment is appropriate when the evidence is "so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient" to overcome summary judgment.  *Id.*  The moving party bears the initial burden of stating the basis for the motion and identifying evidence in the record that demonstrates an absence of a genuine dispute of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party satisfies its burden, the non-moving party must then produce specific evidence proving the existence of a genuine dispute of fact for trial.  *Anderson*, 477 U.S. at 250.

Skyview moves for summary judgment on Henderson's claims for breach of contract, defamation, and tortious interference.  Skyview relies on Kentucky case law in its motion, and Henderson agrees that Kentucky case law governs. [4]

---

[4] Even though Skyview cites no Arizona law in its motion for summary judgment, it argues in its reply that Arizona law should apply to Henderson's breach of contract claim.  Having based its motion for summary judgment on Kentucky law, Skyview cannot change course in its reply. Further, although Skyview points to choice-of-law provisions in other contracts between

1.     *Breach of Contract*

A breach of contract claim under Kentucky law generally requires proof of three elements: "1) existence of a contract; 2) breach of that contract; and 3) damages flowing from the breach of contract."  *Metro Louisville/Jefferson Cty. Gov't v. Abma*, 326 S.W.3d 1, 8 (Ky. App. 2009) (citation omitted).  Henderson says that Skyview breached the Employment Agreement by stripping Henderson of her vice-presidential authority, shifting lucrative accounts away from her, firing her, and then sending alleged defamatory emails.  Skyview contends that Henderson was actually fired for interviewing for a job with a competitor, disparaging Skyview and its executives, and encouraging co-workers to work for a competitor.

The Employment Agreement explicitly provided that Henderson "agree[d] to not entertain or engage in any employment offers during the three year agreement."  (DN 40-1).  But beginning in February 2018 and continuing for several months, the evidence shows that Henderson had numerous contacts and job interviews with high-ranking executives at Entercom.[5]

---

Henderson and Skyview, it is the Employment Agreement that is the basis for Henderson's breach of contract claim, not the other agreements cited by Skyview.  In light of Henderson's domicile in Kentucky and work in numerous other states around the country, Kentucky has the "most significant contacts" to this claim. *See Saleba v. Schrand*, 300 S.W.3d 177, 181 (Ky. 2009).

[5] Skyview's motion for summary judgment is replete with exhibits establishing this fact. *See* DN 62-18, 1-2 (Henderson sets up a call with Fred Bennett to "discuss an opportunity"); DN 62-20, 1 (Henderson is contacted by an Entercom Recruiter who received Henderson's information from Bennett); DN 62-4, 32:5-11 (Henderson had an in-person meeting in New York City with Bennett); DN 62-1, 79:15-81:25 (Henderson spoke with Bob Philips, Entercom's Chief Revenue Officer); DN 62-4, 45:21-24 (Henderson met with Weezie Kramer, Entercom's Chief Operating Officer); DN 62-27, 1 & DN 62-25, 7 (Henderson emailed a list of references to Bennett); DN 62-4, 71:22-24 (Henderson met with Philips); DN 62-7, 4-5 (Henderson met with Jim McCloud, from Entercom's National Client Partnership Group); DN 62-5 (Henderson confirms to a Skyview coworker that she had been "talking with" or "interviewing with" top Entercom employees);  DN 62-33 (Henderson told someone not affiliated with Entercom or Skyview "I'm Actually interviewing for a new job").

Henderson was also bound by a Non-Solicitation and Confidentiality Agreement (the "Confidentiality Agreement") not to disparage Skyview or its officers, employees, and agents. (DN 40-2, 2-10).  It is also well-established that Henderson repeatedly disparaged her supervisor and Skyview's Executive Vice President & General Manager, Jeanne-Marie Condo.[6]

Nonetheless, Henderson says that Skyview failed to establish that she breached the Employment Agreement or Confidentiality Agreement.

First, she argues that her promise to not interview with other employers was not a contract term in the Employment Agreement, but just an understanding that wasn't part of the Employment Agreement.  Under well-settled contract law in Kentucky, "[i]n the absence of ambiguity a written instrument will be strictly enforced according to its terms."  *Mounts v. Roberts*, 388 S.W.2d 117, 119 (Ky. 1965) (citation omitted).  "A contract is ambiguous if a reasonable person would find it susceptible to different or inconsistent interpretations."  *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 385 (Ky. App. 2002) (citations omitted).  When interpreting the contract and assessing ambiguity, "[w]ords are to be accorded their 'ordinarily used meaning unless the context requires otherwise.'"  *New Life Cleaners v. Tuttle*, 292 S.W.3d 318, 322 (Ky. App. 2009) (quoting *Bays v. Mahan*, 362 S.W.2d 732, 733 (Ky. 1962)).  Finally, a court may consider parol evidence only when the express terms of the contract are deemed ambiguous.  *Id.* (citing *Stubblefield v. Farmer*, 165 S.W.2d 556, 557 (Ky. 1942)).

---

[6] Again, Skyview's motion for summary judgment includes numerous exhibits documenting Henderson's disparaging comments regarding Condo.  *See* DN 62-55, 54, 72 (Henderson describing Condo to a former Skyview-employee as "a fool, a liar, and a generally creepy human being," as "[a] cow chewing on cud," and that "[e]verything she says has a lie spin"); DN 62-34, 2-3 (Henderson referring to Condo in conversation with a former Skyview-employee as a "Bitch," an "ass," and a "jerk");  DN 62-53, 2 (Henderson referring to Condo as "evil"); DN 62-54, 2 (Henderson referring to Condo as "a tool").

The express terms of the Employment Agreement are not ambiguous. They clearly precluded Henderson from searching and interviewing for another job during the contract term. Henderson's participation in a series of job interviews with top executives of a Skyview competitor most certainly constituted "entertaining"[7] and "engaging"[8] in an employment offer. While the Agreement does not use the word "interview," no reasonable person could find that Henderson's months-long employment search didn't violate the terms of the Employment Agreement. Henderson would have this contractual term interpreted as merely preventing her from *accepting* an employment offer, but this reading would render meaningless much of the contractual language. *See Killion v. Commonwealth*, No. 2013-CA-000501-MR, 2014 WL 3021316, at *4 (Ky. App. July 3, 2014) ("In contract law, we presume that parties include contractual provisions and terms for a reason."). The Employment Agreement proscribed much more than Henderson's acceptance of another job. The use of the plural "employment offers" shows that the prohibition prevented a job search in the broad sense, not just the acceptance of a singular new job.[9]

There is no genuine dispute that Henderson promised not to interview for another job. Henderson cannot survive a motion for summary judgment by relying solely on her own self-serving deposition to attempt to create a genuine dispute of material fact. *See Bush v. Compass Grp. USA, Inc.*, 683 Fed. App'x 440, 449 (6th Cir. 2017) ("Courts have repeatedly held that a

---

[7] As relevant here, "entertain" means "[t]o bear in mind or consider . . . ." *Entertain*, Black's Law Dictionary (11th ed. 2019).

[8] As relevant here, "engage" means "[t]o employ or involve oneself; to take part in; to embark on." *Engage*, Black's Law Dictionary (11th ed. 2019).

[9] Henderson understood that her Employment Agreement prevented her from interviewing for another job. Just three days after Henderson was placed on administrative leave, she sent a text message to someone saying that Skyview was "trying to fire me for interviewing." When the contact responded that "They can't do that unless it's in a contract," Henderson replied, "I did have an agreement but she was so evil I couldn't take it!!!" (DN 62-43).

13

plaintiff's internally contradictory deposition testimony cannot, by itself, create a genuine dispute of material fact." (citation omitted)).

Henderson next states that even if she did promise not to interview, this promise was not a material term of the Employment Agreement.  "Material terms are those terms essential to the enforcement of a contract."  *C.A.F. & Assocs., LLC v. Portage, Inc.*, 913 F. Supp. 2d 333, 343 (W.D. Ky. 2012).  A "material breach" is defined as "a failure to do something that is so fundamental to a contract that the failure to perform that obligation defeats the essential purpose of the contract or makes it impossible for the other part to perform under the contract."  *CMACO Auto. Sys., Inc. v. Wanxiang Am. Corp.*, 589 F.3d 235, 248 (6th Cir. 2009) (quoting 23 Richard A. Lord, *Williston on Contract*s § 63:3 (4th ed. 2009)).

Henderson's promise not to "entertain or engage in any employment offers" was virtually the only promise she made in the Employment Agreement.  (DN 40-1).  It states that this promise was made "[i]n return" for the lucrative, guaranteed salary Henderson received.  (*Id.*).  This conclusion is further bolstered by the context in which the Employment Agreement was drafted - - to prevent Henderson from resigning to accept a position with a competitor of Skyview.  This term was material.

As to the second reason for Henderson's termination—disparaging comments—Henderson defends herself by arguing that she only spoke negatively about Condo to people who already didn't like Condo.  She says that Skyview can't establish any actual injury resulting from her disparaging comments about Condo and others.  But the opinions of others have no legal significance.  The Confidentiality Agreement provides that "Employee shall not, by himself or herself or with or through any Person . . . make, issue, release, or authorize any written or oral statements to any Person that are derogatory or defamatory in nature with respect to Employer, or

any of its officers, employees, or agents." (DN 62-14, 37).  It is irrelevant that the recipients of Henderson's disparaging comments may have agreed with her.  Skyview did not need to establish any injury in order to fire Henderson for this breach.  These arguments are meritless and are not accompanied by a single case citation.

Finally, Henderson contends that even if she breached the Employment Agreement, Skyview breached the contract first.  She argues that Skyview breached the implied covenant of good faith and fair dealing when it took away some of her accounts, reduced her vice-presidential duties, and refused her access to billing records to verify information on her accounts.   In Kentucky, every contract includes an implied covenant of good faith and fair dealing.  *See O'Kentucky Rose B. Ltd. P'ship v. Burns*, 147 F. App'x 451, 457 (6th Cir. 2005); *see also Ranier v. Mount Sterling Nat'l Bank*, 812 S.W.2d 154, 156 (Ky. 1991).  To succeed on such a claim, the plaintiff must show "that the party alleged to have acted in bad faith has engaged in some conduct that denied the benefit of the bargain originally intended by the parties."  *O'Kentucky*, 147 F. App'x at 458 (quoting 23 Williston on Contracts § 63:22 (4th ed. 2004)).

But regardless of whether Skyview acted in bad faith, Henderson waived these alleged prior breaches by not raising them until now.  "Waiver is defined as an intentional relinquishment of a known right."  *Bates v. Grain Dealers Nat'l Mut. Fire Ins. Co.*, 283 S.W.2d 3, 5 (Ky. 1955). "Whether a party's actions constitute a waiver is a question of law."  *Lyles v. RDP Co.*, 702 F. App'x 385, 398 (6th Cir. 2017) (citation omitted).   Henderson cannot secretly determine the contract was breached, fail to inform Skyview of its breach, and then violate the contract, all while continuing to reap the substantial benefits of the same contract. Henderson received hundreds of thousands of dollars in compensation under the Employment Agreement while she was

simultaneously breaching it.  Only when her breaches were discovered did she then try to shift blame back to Skyview.

Without question, Henderson violated both the Employment Agreement and the Confidentiality Agreement.[10]  Because there were indisputably justifiable reasons for her termination, Henderson's breach of contract claim against Skyview should be dismissed.

## 2.   *Defamation*

Henderson's claims for defamation *per se* and defamation *per quad*[11] are based on the two emails Condo sent to Henderson's email contact list—stating that she was "on administrative leave" and was "no longer employed with Skyview Networks."  (DN 35, ¶52).  A claim for defamation under Kentucky law requires the plaintiff to prove the following elements:  "(a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication."  *Toler v. Sud-Chemie, Inc.*, 458 S.W.3d 276, 282 (Ky. 2014), *as corrected* (Apr. 7, 2015).

Skyview contends that the emails cannot serve as the basis of the defamation claims because they were truthful.  In Kentucky, as elsewhere, "[t]ruth is always a complete defense to defamation."  *Toler*, 458 S.W.3d at 289 n.55.  In response to Skyview's request for admissions,

---

[10] The Confidentiality Agreement also prohibited Henderson from soliciting any Skyview personnel for other employment.  (DN 62-14).  While not as clear as the first two grounds for dismissal, Skyview again provides evidence that Henderson encouraged Kimberly Ball, a Skyview Vice President of Sales, to also speak with a top official at Entercom.  (DN 62-5, 176:1-18).

[11] "The difference between defamation *per se* and defamation *per quod* is that, in the former, damages are presumed and, in the latter, the plaintiff must prove special damages."  *Kenney v. Hanger Prosthetics & Orthotics, Inc.*, 269 S.W.3d 866, 870 (Ky. App. 2007) (citing *Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 794 (Ky. 2004)).  The arguments in this section apply equally to both defamation claims.

16

Henderson admitted that she was on administrative leave from Skyview as of July 13, 2018 and no longer employed by Skyview as of August 7, 2018.  (DN 62-8, 2-3).  The emails in question are irrefutably true, which serves as an absolute defense to a claim for defamation.

Recognizing her untenable position, Henderson cites a variety of cases for the proposition that literal truth is not a defense if a false, defamatory meaning is also conveyed.  *See, e.g.*, *Mann v. Heckler & Koch Def., Inc.*, 639 F. Supp. 2d 619, 634 (E.D. Va. 2009), *aff'd*, 630 F.3d 338 (4th Cir. 2010) ("[T]he meaning of a defamatory statement may come, not only from the actual words used, but also from any 'inferences fairly attributed to them.'") (quoting *Wells v. Liddy*, 186 F.3d 505, 523 (4th Cir. 1999)).

Henderson's argument suffers from several shortcomings.  First, she contends that the email revealing her administrative leave, while literally true, would cause readers to infer that Henderson engaged in misconduct. But this inference would also be true -- Henderson breached her employment and confidentiality contracts.

Second, Henderson's reliance on *Mann v. Heckler & Koch Defense, Inc*. is misplaced.  In *Mann*, the defendant sent out an email noting that the plaintiff was "placed on administrative leave . . . pending an internal investigation," which was true.  *Mann*, 639 F. Supp. 2d at 634.  The court found that this email falsely implied that the plaintiff was on administrative leave because he was the *subject* of the investigation.  But he was actually on leave because he was the *instigator* of the investigation.  *Id*. at 635.  The court concluded that "whether one is the subject of an investigation or the instigator of the investigation is . . . a key distinction in the work place."  *Id*.

Henderson was the subject of the investigation.  If the recipients of Condo's email drew that inference, they were correct.  If the email recipients inferred that Henderson was in some kind of trouble with her employer, again, they were also correct.  Henderson claims that she was

17

defamed by two emails that stated only irrefutable facts.  Skyview is entitled to summary judgment on Henderson's defamation claims.

### 3.   *Tortious Interference*

Henderson alleges that Skyview wrongfully interfered with her "substantial business relationships in the broadcast communications industry."  (DN 35, ¶ 101).  In Kentucky, "[o]ne who intentionally and improperly interferes with another's prospective contractual relation . . . is subject to liability for the pecuniary harm resulting from loss of the benefits of the relation . . ." *Ventas, Inc. v. HCP, Inc*., 647 F.3d 291, 306 (6th Cir. 2011) (quoting Restatement (Second) of Torts § 766B (1979)).  A claim for tortious interference with business relations requires proof of six elements:  "(1) the existence of a valid business relationship or expectancy; (2) that the defendant was aware of this relationship or expectancy; (3) that the defendant intentionally interfered; (4) that the motive behind the interference was improper; (5) causation; and (6) special damages."  *Halle v. Banner Indus. of N.E., Inc*., 453 S.W.3d 179, 187 (Ky. App. 2014) (citing *Monumental Life Ins. Co. v. Nationwide Retirement Sols., Inc*., 242 F. Supp. 2d 438, 450 (W.D. Ky. 2003)).

Skyview says that this claim must be dismissed because Henderson cannot prove a valid business relationship or expectancy because the business relationships in question were actually Skyview's, not Henderson's.  "[U]nder Kentucky law, one cannot tortiously interfere with *one's own* prospective business relationship."  *United States ex rel. Doe v. Jan-Care Ambulance Serv*., 187 F. Supp. 3d 786, 794 (E.D. Ky. 2016). As to the recipients who were Skyview's clients, Henderson could not have had a valid business expectancy.

This claim is muddied somewhat by the fact that many of the recipients of the two emails were Louisville-based professionals who were not Skyview's employees or clients.  As to these

individuals, Skyview says that Henderson has failed to show that any alleged interference was "improper." *See Excel Energy, Inc. v. Cannelton Sales Co*., 246 F. App'x 953, 967 (6th Cir. 2007) (citation omitted).  But even if Skyview acted improperly here, Henderson still must show that this action has harmed her.  "If the plaintiff fails to produce evidence of special damages, summary judgment is appropriate on the claim for tortious interference with business relations." *Acuity Brands, Inc. v. Bickley*, 172 F. Supp. 3d 971, 992 (E.D. Ky. 2016), *on reconsideration in part*, 2017 WL 1426800 (E.D. Ky. Mar. 31, 2017) (citations omitted).  While it may be unfortunate that Henderson's professional contacts unnecessarily received these emails, she has not provided evidence or even an argument that she experienced specific damages as result.  *See Canning v. Poole*, No. 10-16-JBC, 2012 WL 5198453, at \*4 (E.D. Ky. Oct. 18, 2012).

Henderson's tortious interference claim cannot be based on Skyview's conduct in relation to its own clients.  Further, with regard to the non-business contacts, Henderson has failed to provide any evidence of special damages.  Skyview is entitled to summary judgment on Henderson's tortious interference claim.

### 4.    *Fed. R. Civ. Pro. 56(d) Relief*

Finally, Henderson briefly invokes Fed. R. Civ. Pro. 56(d)[12] to argue that she is entitled to additional fact discovery. "The burden is on the party seeking additional discovery to demonstrate why such discovery is necessary." *Summers v. Leis*, 368 F.3d 881, 887 (6th Cir. 2004) (citation omitted).

---

[12] "If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:  (1) defer considering the motion or deny it;  (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d).

Henderson provided a declaration of her attorney clarifying that Henderson's request for additional discovery relates to "Skyview's motivation to drive Henderson out of the company [and] then blackball her in the industry." (DN 81-1). Henderson moved to compel additional discovery after Skyview filed the present motion for summary judgment. (DN 69). This motion was granted in part and denied in part. (DN 94). Reviewing the declaration, Henderson's motion to compel, and the Magistrate Judge's order, Henderson has not carried her burden of specifically demonstrating how the additional discovery would save her claims for breach of contract, defamation, or tortious interference. Henderson's motion for Fed. R. Civ. P. 56(d) relief is denied.

## C.   **Henderson's Motion for Summary Judgment and Rule 37 Relief**

### 1.   *Fed. R. Civ. P. 37(c)(1) Relief*

Henderson moves for relief under Fed. R. Civ. P. 37(c)(1),[13] arguing that Skyview failed to properly disclose information regarding its damages computation, which is a required initial disclosure under Fed. R. Civ. P. 26. (DN 79).

Henderson first challenges Skyview's alleged failure to disclose damages calculations in relation to Skyview's attempt to recover the compensation it paid to Henderson while she was employed. This argument is not persuasive for the simple reason that Henderson clearly knew how much she had been paid by Skyview. Any failure by Skyview to disclose its damages computation here would be harmless.[14] Additionally, as highlighted by Skyview and not contested by Henderson, disgorgement is an equitable remedy to which the Fed. R. Civ. P. 26 initial

---

[13] "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

[14] Skyview also notes that it did, in fact, provide full disclosure of Henderson's compensation from October 2014 to August 2018. (Def.'s Resp. Pl.'s Mot. Summ. J. & Rule 37 Relief Ex. D).

disclosure rules do not apply.  *See, e.g., United States v. RaPower-3, LLC*, No. 2-15-CV-00828-DN, 2018 WL 1581994, at *1 (D. Utah Mar. 14, 2018).

Second, Henderson contends that Skyview failed to disclose its damages calculations in relation to lost revenue.  Skyview's disclosure states that it "provided past revenue numbers for Starcom accounts and will use those numbers to project future losses based on Ms. Henderson's conduct." (DN 79-2, 7-8).  While somewhat unclear, Henderson does not contest that prior to the close of discovery she received financial information from Skyview about the Starcom accounts. (DN 89-8, 2-3).  As such, Henderson is not entitled to any relief under Fed. R. Civ. P. 37(c)(1).

## 2.   *Summary Judgment*

Beyond the Rule 37 issues, Henderson also moves for summary judgment on two of Skyview's theories of damages:  disgorgement and lost revenue from the Starcom accounts.

Skyview contends that both Arizona and Kentucky law provide, under the Restatement (Second) of Agency, for disgorgement of the compensation received by an agent after his or her breach of loyalty.[15]  *See, e.g.*, *HTS, Inc. v. Boley*, 954 F. Supp. 2d 927, 955 (D. Ariz. 2013). Because it is an equitable remedy, this Court has wide discretion when determining whether disgorgement is appropriate.  *W. T. Grant Co. v. Indian Trail Trading Post, Inc.*, 438 S.W.2d 91, 92 (Ky. 1968) ("[W]hen a litigant selects an equitable remedy he necessarily submits the enforcement of his rights to the traditional discretionary powers of equity." (citation omitted)).

"An equitable disgorgement award seeks to deprive the wrongdoer of his ill-gotten profits." *Osborn v. Griffin*, 865 F.3d 417, 452 (6th Cir. 2017) (citation omitted).  Skyview has not established that Henderson received any "ill-gotten profits" as a result of her disloyal conduct.  To

---

[15] Upon review of the pertinent case law, the outcome is the same regardless of which state's law is applied.

the contrary, it appears that Henderson generated millions of dollars in sales for Skyview during her period of disloyalty. (DN 92, 2). It would be irrational to allow Skyview to keep the revenue generated by Henderson while simultaneously recouping the salary it paid to her.

This circumstance is not comparable to others in which disgorgement has been applied. *See Osborn*, 865 F.3d at 430, 455 (affirming a remedy of equitable disgorgement against defendants who, in a long-term scheme, defrauded their sisters out of much of their parents' estate); *Boley*, 954 F. Supp. 2d at 956 (ordering a disgorgement of salary where the employee "developed a competing company, made plans with one of [the employer's] existing clients, gave away [the employer's] products to curry favor with one potential investor or business partner, and solicited investors for his competing business while employed by [the employer]"). In this case, Henderson has obtained no extra benefit as a result of her wrongdoing, nor has Skyview identified any additional revenue retained by Henderson. An award of disgorgement is not warranted under the present facts.

If Skyview suffered financial harm as a result of Henderson's wrongful actions, the more appropriate remedy would appear to be a remedy at law—i.e., damages based on lost profits Skyview suffered from Henderson's disloyal conduct. Even though Henderson received no apparent ill-gotten benefit for disgorgement purposes, she could still be accountable for harm she may have caused to Skyview in the form of lost accounts and profits. Skyview intends to pursue damages based on its "lost revenue/profits arising out of Henderson's disloyal and disparaging conduct" and has disclosed that it intends to use past Starcom revenue numbers to project future losses. (DN 89, 9; DN 79-2, 7-8).

Henderson contends that Skyview's lost revenue damages are "pure speculation." (DN 79, 4). She points to the deposition testimony of two Starcom employees, who stated that Henderson's

removal from the Starcom account did not have a negative impact on Skyview's chances of securing business.  (DN 79-3, 145:3-11; DN 79-4, 19:3-20:10).  Skyview counters, however, that a genuine factual dispute exists as to causation—i.e., whether Henderson's conduct caused Starcom to do less business with Skyview. Skyview points to a series of text messages between Henderson and a Starcom representative in which Henderson disparaged her replacement and suggested that Skyview might be "zipped from business." (DN 62-32, 19-20).  Skyview says that it didn't receive any more business from Starcom after this discussion.  (DN 63).  It is unclear whether Skyview's loss of business with Starcom was the result of natural market forces, Henderson's conduct, or some other reason.  This disputed question of fact is therefore one for the jury.

Last, Henderson argues that Skyview cannot sustain a claim for its lost revenues as a matter of law, only its lost profits.  *See DXS, Inc. v. Siemens Med. Sys., Inc*., 100 F.3d 462, 473 (6th Cir. 1996) ("Damages for lost profits must be based on the loss of net profits rather than gross profits. 'Any other rule would obviously grant the offended litigant a greater sum than he would have earned had the breach not occurred.'"  (internal citation omitted) (citation omitted)).  Skyview appears to concede this point, noting that it would use lost revenue only as a means to calculate its lost net profits.  (DN 89, 12-15).

Skyview cannot pursue the equitable remedy of salary disgorgement against Henderson. There remains, however, a genuine dispute of material fact as to whether Henderson's conduct caused Skyview to lose business with Starcom.

### D.   Skyview's Motion to Strike

Finally, Skyview moves to strike DN 81-2, the Declaration of Karen Henderson, in its entirety.  Alternatively, Skyview requests that this Court strike paragraphs four through eight of

the Declaration.  As previously noted, however, the Employment Agreement was not ambiguous and therefore Henderson's subjective beliefs regarding the meaning of the contract terms are meaningless.  The Court will deny this motion as moot.

### III.   <u>CONCLUSION</u>

Henderson stated a claim for wrongful discharge under Fed. R. Civ. P. 12(b)(6), but her claims for defamation, breach of contract, and tortious interference cannot survive summary judgment and should be dismissed.  If Skyview moves for summary judgment on Henderson's wrongful discharge claim, Henderson likely cannot survive summary judgment on it either.

Skyview may not pursue the equitable remedy of disgorgement but may seek damages for lost profits caused by Henderson's conduct.

Skyview's motion to strike Henderson's post-deposition affidavit is denied as moot.

Justin R Walker, District Judge
United States District Court

July 24, 2020